Delia FAJARDO, Guardian ad litem for minors Denise Navarro, Raymond Navarro, Jr. & Claudia Navarro; Elvia Garcia Fajardo, Guardian ad litem for minors Denise Navarro, Raymond Navarro, Jr., & Claudia Navarro; Berta Galvan, Guardian ad litem for minors Denise Navarro, Raymond Navarro, Jr., & Claudia Navarro; Denise Navarro; Raymond Navarro, Jr.; Claudia Navarro, minors by and through their Guardians ad Litem, Plaintiffs–Appellants,

v.

COUNTY OF LOS ANGELES; Sherman Block, Sheriff of Los Angeles County, Defendants–Appellees.

No. 96–55699.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 16, 1998.

Filed June 3, 1999.

Marco E. Lopez, San Jose, California, attorney for the plaintiffs-appellants.

Kevin C. Brazile, Assistant County Counsel, Los Angeles, California, attorney for the defendants-appellees.

Before: PREGERSON, D. W. NELSON, and KLEINFELD, Circuit Judges.

Opinion by Judge PREGERSON; Concurrence by Judge KLEINFELD.

PREGERSON, Circuit Judge:

Denise Navarro and other relatives of decedent Maria Navarro ("the Navarros") appeal the district court's grant of judgment on the pleadings in favor of the defendants under Federal Rule of Civil Procedure 12(c). The Navarros sued Defendants under 42 U.S.C. § 1983 for allegedly giving lower priority to domestic-violence 9–1–1 calls than to non-domestic-violence 9–1–1 calls.

This case is before us for the second time.[1] The case first came to us on appeal from the district court's grant of summary judgment in favor of Defendants. *See Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995) (*"Navarro I "*). In *Navarro I*, we held that the Navarros had established a genuine issue of material fact for trial by offering evidence that 9–1–1 "dispatchers in practice treat domestic violence calls differently from non-domestic violence calls." *Id.* at 715. We also held that the Navarros' equal protection claim survived summary judgment because "they could prove that the domestic violence/non-domestic violence classification fails even the rationality test" under the Equal Protection Clause. *Id.* at 717. Accordingly, we reversed and remanded "the district court's grant of summary judgment … because genuine issues of material facts remain[ed] as to whether [Defendants] had a custom of not classifying domestic violence 9–1–1 calls as 'emergencies.'" *Id.*

On remand, the district court determined that it did not need to decide whether a custom or policy existed because it had "previously found that such a [policy] meets the rational basis test." Accordingly, the district court granted Defendants' Rule 12(c) motion for judgment on the pleadings. We again reverse and remand.

## STANDARD OF REVIEW

■ This court reviews de novo Rule 12(c) judgments on the pleadings. *See Merchants Home Delivery Serv., Inc. v. Hall & Co.*, 50 F.3d 1486, 1488 (9th Cir. 1995). A judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law. *See id.*

## ANALYSIS

■ On remand, the district court ruled that Defendants' practice of treating domestic-violence calls differently from non-domestic-violence calls passed the rational basis test as a matter of law because (1) it is rational to limit emergency response to in-progress calls, and (2) "9–1–1 emergency assistance is provided for individuals who are severely injured and near death and domestic violence *rarely* reaches this level of injury." Defendants argue that these rationales justify discriminating against domestic-violence crimes.

It does not matter whether it is rational to distinguish between in-progress calls and not-in-progress calls because that was not the distinction that Defendants allegedly made. The Navarros allege that Defendants distinguished between domestic-violence 9–1–1 calls and non-domestic-violence 9–1–1 calls regardless of whether the violence was in progress.

Moreover, whether domestic violence "rarely" results in death or severe injury does not, by itself, end the matter. The

---

1. The factual basis for the Navarros' claim is described in *Navarro v. Block*, 72 F.3d 712 (9th Cir.1995).

critical issue is whether domestic-violence crimes result in severe injury or death less frequently than non-domestic-violence crimes that *are* considered 9–1–1 emergencies. *See Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (indicating that the Equal Protection Clause requires the same treatment of "similarly situated" persons).[2] Nothing in the pleadings suggests that victims of domestic violence are less likely to suffer severe injury or death than are victims of other 9–1–1 emergency crimes.[3]

Hence, the district court erred by equating domestic violence calls with not-in-progress calls and equating non-domestic violence calls with in-progress calls, and by assuming that domestic-violence crimes are less injurious than non-domestic-violence crimes. Because these assumptions formed the basis of the district court's conclusion, the district court also erred when it concluded, as a matter of law, that Defendants' domestic-violence/non-domestic-violence classification was rational and reasonable under equal-protection analysis.

The separate concurrence reasons that (1) there is no evidence of a domestic violence/non-domestic violence classification, and (2) that even if such a classification were proved, it would not violate equal protection.

The concurrence overlooks the evidence cited in our first opinion. *See Navarro I*, 72 F.3d at 715 & n. 4 (noting that a 9–1–1 dispatcher had testified that it was the practice of the Sheriff's department not to classify domestic violence calls as emergency procedure calls). To the extent that the concurrence relies on the lack of any record evidence with regard to a policy or custom that discriminated against *women*, it misses the point. In our earlier decision, we remanded for a hearing on the question whether the County had a policy or custom that discriminated against victims of domestic violence. *See id.* at 717.

The concurrence also cites six cases for the proposition that, absent evidence of sex discrimination as a motivating factor, there is no constitutional claim. But the foundational case, *Watson v. City of Kansas*, 857 F.2d 690 (10th Cir.1988),[4] is in perfect harmony with our disposition in this case. In *Watson*, the district court granted summary judgment to the defendants on the question whether the police violated a domestic abuse victim's rights to equal protection by failing to provide the same police protection to victims of domestic violence that they provided to victims of non-domestic violence. On appeal, the Tenth Circuit found that the plaintiff had failed to state a prima facie case for *sex-based* discrimination and affirmed the district court's grant of summary judgment

**2.** Additionally, if the Navarros can prove at trial that Defendants dispatch peace officers to prevent crimes that pose less (or equal) risk of death or severe injury than that posed by domestic violence crimes, then the Navarros would establish that Defendants' asserted justification is a pretext. If Defendants' justification for discriminating against domestic-violence crimes is nothing more than pretextual, then Defendants' actions are arbitrary and violate the Equal Protection Clause. *See Lockary v. Kayfetz*, 917 F.2d 1150, 1155–56 (9th Cir.1990) (reversing grant of summary judgment on equal protection claim because plaintiffs raised triable issues of fact as to whether the defendant's alleged rationale was merely a pretext).

**3.** The 9–1–1 operator testified in her deposition that "shots fired" and robberies were considered emergencies. But nothing in the record indicates that "shots fired" or robberies result in death or severe injury any more frequently than domestic-violence crimes. The Navarros should be allowed to develop further this and other similar evidence.

**4.** The concurring opinion also cites the following cases: *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.1995), which is not an equal protection case; *McKee v. City of Rockwall*, 877 F.2d 409 (5th Cir.1989), in which the plaintiff failed to establish that the city had a discriminatory custom or policy; and *Soto v. Flores*, 103 F.3d 1056, 1066 (1st Cir.1997), *Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir. 1994), and *Hynson v. City of Chester*, 864 F.2d 1026, 1031 (3rd Cir.1988), which purportedly follow *Watson*.

on *this* ground. But the Tenth Circuit also held that, because there were disputed issues of material fact concerning whether the police had a "policy or custom of affording less protection to victims of domestic violence than to victims of non-domestic attacks," the district court erred in granting summary judgment to the defendants on *that* basis.

Here, the Navarros sued Defendants for allegedly giving lower priority to 9–1–1 domestic-violence calls than to non-domestic-violence calls. Here, there are disputed issues of material fact on the question whether Defendants had such a policy. In our earlier opinion, we reversed the district court's grant of summary judgment on this ground, and we now reverse the district court's grant of judgment on the pleadings.

REVERSED and REMANDED for a hearing to determine first, whether the city had a policy or custom of giving lower priority to domestic-violence calls than to non-domestic-violence calls, and second, if such a policy or custom exists, whether that policy or custom has a rational basis.

KLEINFELD, Circuit Judge, concurring:

I reluctantly concur in the result. The majority decision is based on a mistaken reading of the record. It has the unfortunate consequence that we substitute an appellate court's views for the sheriff's views on which 911 calls get priority.

We decided in our prior panel opinion, *Navarro v. Block*, 72 F.3d 712 (9th Cir. 1996), that the plaintiffs had sufficient evidence for their equal protection claim to establish a genuine issue of material fact. Our earlier opinion was, in my view, mistaken. In today's opinion, the majority mistakenly conflates the evidence, relevant to an appeal from summary judgment, with the pleadings, relevant to an appeal from judgment on the pleadings, thereby compounding the previous error.

The complaint alleges an intentional policy of denying protection to abused women

who complain of domestic violence. That does not state a due process claim because *DeShaney v. Winnebago Cty. Soc. Servs. Dept.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) holds that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195, 109 S.Ct. 998. *DeShaney* means, as applied to this case, that plaintiffs could not assert a constitutional tort under the Due Process Clause based on the sheriff's failure to protect Maria Navarro from her husband.

Plaintiffs' claim can only be based on the Equal Protection Clause. We are reviewing a judgment on the pleadings, and the complaint stated a claim upon which relief could be granted, so that should be the end of the case. The allegation of the complaint necessitates reversal, but not on the expansive rationale used by the majority. If the government were to pick a class of people, by sex, race or some other inappropriate characteristic, and deny people in that class the same protection law enforcement and legal institutions afforded to other people, that classification would implicate the Equal Protection Clause. *DeShaney* says that, "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *Id.* at 197 n. 3, 109 S.Ct. 998. The Equal Protection Clause theory asserted in the complaint is that the sheriff provided less police protection to women than others. The assertion is enough to survive judgment on the pleadings, because the issue in an appeal from a judgment on the pleadings is not whether the evidence shows a denial of equal protection, but merely whether the pleadings assert it.

The reason I point out that we erred in our earlier decision, and the district court was right the first time, is that the case really has gone beyond the pleadings, to summary judgment, and there was no evidence submitted on that motion to support

a claim of invidious discrimination. The majority opinion says that my concurrence "overlooks the evidence cited in our first opinion." Evidence actually has nothing to do with an appeal of judgment on the pleadings; we are supposed to decide such an appeal based on what the pleadings say. But because of the expansive approach the majority has taken, there is no avoiding a discussion of the evidence. And the majority, in my view, has the evidence wrong.

The majority now seems to concede that there is a lack of record evidence of discrimination against women, but to assert that there is evidence of unconstitutional discrimination against victims of domestic violence ("To the extent that the concurrence relies on the lack of any record evidence with regard to a policy or custom that discriminated against *women*, it misses the point .... we remanded for a hearing on the question whether the County had a policy or custom that discriminated against victims of domestic violence."). Since women, but not victims of domestic violence regardless of sex, are a class of people for whom a higher level of Equal Protection scrutiny is applied, the majority's concession destroys the foundation for its opinion. Without women as the class of persons denied equal protection of the law, there is no serious equal protection claim. The complaint does claim discrimination against women. It alleges a sheriff's policy that "denied abused women—who complained of threatened domestic violence ... equal protection of the laws." The complaint therefore does state an equal protection claim, but evidently the majority concedes that when the case previously came up on summary judgment, there was no evidence for that claim.

The uncontradicted evidence in the record is that there was no policy of denying immediate police response to women. Nor was there any evidence of a policy of denying immediate police response in domestic violence cases. What the evidence showed, and all that it showed, was a policy of giving higher priority to calls reporting violence in progress than to calls reporting threats of violence. So far as the evidence showed, it did not matter whether the threats were of domestic or non-domestic violence. What mattered was whether the violence had already started or whether it was threatened for the future. That is a classification, but it is not invidious. There is a rational basis for treating violence not yet occurring differently from violence already occurring.

The only evidence directly in point was a deposition by the dispatcher, who tragically did not send immediate police assistance to Maria Navarro when she called and reported that her husband was on his way over to kill her. The dispatcher testified that "there's no written policy" for when the dispatcher should send the police. She made the decision in her discretion, "based on my training, my experience, and so forth." In the training, some calls were designated as lights and siren, such as "baby not breathing, shots fired," "when a hospital is in need of a certain type of blood, we're transporting the blood," "felonies in progress, robbery."

The dispatcher testified that the category of "domestic violence" was ambiguous, because it included lights and siren circumstances and discretionary circumstances. She testified that the practice was to distinguish between "where a person has intentionally caused bodily injury to another, intentionally or recklessly caused bodily injury to another or has placed that person in a position where they would be exposed to some type of danger or possibly in danger" from "a threat by an individual." In the first type of domestic violence, "a crime has been committed," and "we would send a police car out there." For the second type, the threat, "they're all very unique. You use your own judgment on what exactly is done, and what exactly the caller is telling you." There was no policy on a threat call other than that the dispatcher was to use her discretion.

The classification for which there was evidence, between threatened violence and violence already taking place, is not a classification by sex. It is also not a classification according to whether the violence is domestic or non-domestic. It has no relationship to a classification by sex. The evidence showed no distinction between the treatment of calls involving a domestic violence threat compared to any other kind of deadly threat. For example, if a person called and said "someone I fired last week is coming over to my store to kill me," the dispatcher's testimony indicates that she would have treated that as a threat call, for which there was no policy other than to use her discretion, as opposed to a felony in progress call, for which she would have necessarily sent a car with lights and siren. She might or might not send a lights and siren car in a threat case, whether domestic or non-domestic, and would have in a felony in progress case, domestic or non-domestic. The distinction was not by sex, or by whether the threat was domestic, but rather by whether the violence was threatened or already occurring.

Based on this uncontradicted evidence, we should have affirmed the summary judgment in the earlier appeal. The evidence established no policy classifying people by sex, and no policy of giving lower priority to domestic violence calls. There was a tragic error, at least in hindsight, in failing to send a lights and siren car to Mrs. Navarro's house immediately, but that is not a denial of equal protection of the laws that entitles a federal court to rearrange sheriff's office policies. The higher priority given to felonies in progress as compared with crimes threatened but not in progress, raises no serious equal protection issue, because the level of scrutiny appropriate to it is rational basis, and there is an obvious rational basis for the different priorities. A threat may not materialize, through failure of will or means by the perpetrator, or avoidance by the prospective victim. "Shots fired" and "felony in progress" have already materialized. Perhaps the sheriff's office should

have given threats of deadly violence higher priority than hospital transfer of blood or some felonies in progress, but this is a policy question, not a constitutional question under the Equal Protection Clause.

The First, Third, Fourth, Fifth, Eighth, and Tenth Circuits have rejected the constitutional claims being asserted around the country based on failure of police to prevent domestic violence. These circuits have all held that unless sex discrimination is a motivating factor, there is no constitutional claim. *See Soto v. Flores,* 103 F.3d 1056 (1st Cir.1997)(rejecting equal protection and due process claims where plaintiff failed to show discriminatory intent); *see also Pinder v. Johnson,* 54 F.3d 1169 (4th Cir.1995)(en banc)(rejecting due process claim because there is no constitutional right to affirmative protection by the state); *see also Ricketts v. City of Columbia,* 36 F.3d 775 (8th Cir.1994)(rejecting equal protection claim where no evidence of any discriminatory intent by police against women); *see also McKee v. City of Rockwall, Tex.,* 877 F.2d 409 (5th Cir.1989) (rejecting equal protection claim where no there is no evidence of any discriminatory intent or police policy treating domestic violence cases differently); *see also Hynson v. City of Chester,* 864 F.2d 1026 (3d Cir.1988)(requiring a showing of discriminatory motivation for an equal protection claim to survive summary judgment); *see also Watson v. City of Kansas,* 857 F.2d 690 (10th Cir.1988) (requiring a showing of discriminatory motivation for an equal protection claim). *Hynson* and *Watson* remanded for evidence of discriminatory intent or effect toward women, but in the case at bar, plaintiffs had the opportunity to prove discriminatory intent, and were unable to do so. What they proved was tragic, and the murder might give rise to a state tort claim of negligence, but it does not give rise to a federal constitutional claim, because *DeShaney* establishes that there is no constitutional right to a bodyguard against a likely threat to life.

The potential harm caused by our decision today, as well as by our prior decision, is that we substitute our judgment for that of the police about how they set priorities for responding to calls. No one has given us the authority to do that. And we do not know enough about police work to do that. So long as the police have a rational basis for the non-invidious classifications they make, the remedies for their mistakes are those afforded by state law in state courts. This kind of question, "to what 911 calls should we automatically send a car with lights and siren," needs experienced police officers around a table arguing about it. They can talk usefully relating their experiences to what needs to be done and what can be done, based on their knowledge of what kinds of calls come in, and what kinds of harms can be averted by an immediate lights and siren dispatch, how many officers are available for response, how long the responses will take, and all sorts of other questions that we lack the specialized knowledge to even think of, let alone answer. Nor do our commissions authorize us to make this sort of policy decision.

Our opinion is subject to the reading that police must provide bodyguards against threats of domestic violence, unless they can prove that victims of such threats are less likely to be killed or seriously injured than victims of robberies and "shots fired" crimes. It is unlikely that the police can prove that, because such hypothetical social science propositions are inherently hard to prove. As a practical matter, our decision may simply force police throughout the Ninth Circuit to give at least as high a priority to 911 calls that say "my spouse is coming home and *threatens* to kill me" as to calls that say "someone is *now killing* someone on the street in front of my house." I cannot see why the police have to prove anything to us when they make non-invidious classifications with a rational basis of 911 calls.